**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**Judge Nina Y. Wang**

Civil Action No. 22-cv-0722-NYW

S.T.W.,[1]

      Plaintiff,

v.

KILOLO KIJAKAZI, Acting Commissioner of the Social Security Administration,[2]

      Defendant.

---

## MEMORANDUM OPINION AND ORDER

---

      This civil action arises under Titles II and XVI of the Social Security Act (the "Act"), 42 U.S.C. §§ 401–33, for review of the final decision made by the Commissioner of Social Security Administration (the "Commissioner" or "Defendant") denying the applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") filed by J.D.C.W. ("Plaintiff or "J.D.C.W.").[3]  After carefully considering the Parties' briefing, the Administrative

---

[1] The Local Rules for this District provide that "[a]n order resolving a social security appeal on the merits shall identify the plaintiffs by initials only."  D.C.COLO.LAPR 5.2(b).  On January 6, 2023, this Court granted Plaintiff's Unopposed Motion to Substitute Parties, based on the death of claimant J.D.C.W. [Doc. 14; Doc. 15].  Claimant J.D.C.W.'s surviving spouse was thus substituted as Plaintiff in this action.

[2] On July 9, 2021, President Biden appointed Kilolo Kijakazi as Acting Commissioner of Social Security.  Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Commissioner Kijakazi should be substituted as the defendant in this suit.  No further action need be taken to continue this suit pursuant to the Social Security Act, 42 U.S.C. § 405(g) ("Any action instituted in accordance with this subsection shall survive notwithstanding any change in the person occupying the office of Commissioner of Social Security or any vacancy in such office.").

[3] Although J.D.C.W.'s surviving spouse has been substituted as Plaintiff in this action, *see supra*, n.1, the Court will continue to refer to Plaintiff as J.D.C.W.

Record, and the applicable case law, this Court respectfully **AFFIRMS** the Commissioner's decision.

## BACKGROUND

Plaintiff, born November 12, 1971, filed an application for DIB and SSI on January 24, 2020, alleging he became disabled on January 3, 2020. [Doc. 8-5 at 285, 292].[4] Plaintiff claims he could not work due to the following medical conditions: Chiari malformation,[5] heart disease, and lung disease. [Doc. 8-3 at 161]. The Social Security Administration (the "SSA") initially denied Plaintiff's claim on June 15, 2020. [Doc. 8-4 at 188]. Upon reconsideration, the SSA again denied Plaintiff's claim on December 28, 2020. [*Id.* at 207]. Plaintiff requested a hearing before an administrative law judge ("ALJ") on January 12, 2021. [Doc. 8-2 at 15]. ALJ Bryan Henry presided over the hearing telephonically on July 26, 2021, during which the ALJ heard testimony from Plaintiff and Vocational Expert ("VE") Kent Granat. [*Id.*].

***The ALJ Hearing.*** At the hearing, Plaintiff testified that he attempted to work in September 2020, doing home healthcare, but only "lasted two weeks." [*Id.* at 44–45]. He explained that he was able to work for half an hour until his feet became "so numb that it hurt to walk. It felt like [he] was walking on thumbtacks." [*Id.* at 45]. And despite taking medication, Plaintiff stated that his "legs still swell up" from water retention on a daily basis. [*Id.* at 45, 47]. Plaintiff also testified that he could dress himself, but he would sometimes get lightheaded while taking a shower, and he had "put medical bars in the bathroom just recently" as a precaution

[4] When citing to the Administrative Record, the Court utilizes the docket number assigned by the CM/ECF system and the page number associated with the Administrative Record, found in the bottom right-hand corner of the page. For all other documents, the Court cites to the document and page number generated by the CM/ECF system.

[5] Plaintiff explained in his Opening Brief that "'Chiari malformation type 1 occurs when the section of the skull containing a part of the brain (cerebellum) is too small or is deformed, thus putting pressure on and crowding the brain.'" [Doc. 10 at 13 n.1].

because he would experience headaches that would sometimes cause him to "physically blackout" or fall down in the shower.  [*Id.* at 46].  Plaintiff also stated that he had been experiencing the headaches for 11 years and felt "constant pressure . . . [for] 24 hours a day."  [*Id.* at 56].

With respect to the edema in his lower extremities, Plaintiff stated that, in addition to taking medication and making changes to his diet, "[t]he only thing [he] could really do is[] walk a little bit," but he could not walk a full block without getting winded and starting to cough.  [*Id.* at 48].  Plaintiff specified that he could "usually get through just a little bit more than half a block" before he would need to stop and rest to catch his breath.  [*Id.* at 62–63].  He also stated that he "walk[s] with a cane for balance," [*id.* at 49], and he used the cane "all the time because [he] get[s] unsteady quite often," [*id.* at 60].  Plaintiff indicated that he began using the cane around June 2021, although he was provided a walker during a hospital stay in July 2020.  [*Id.* at 66].

With respect to daily living activities, Plaintiff testified that his family would not allow him to perform any strenuous activities around the house to avoid exacerbating his pulmonary hypertension.  [*Id.* at 49].  He noted, however, that he took medication which controlled his pulmonary hypertension, and it only intensified when he was "active or [did] something strenuous."  [*Id.*].  Plaintiff's blood pressure was likewise controlled with medication.  [*Id.* at 56].  Plaintiff also testified that his wife and daughter handled most of the cooking; his children did "most of the cleaning, heaving cleaning," although he was "allowed to fold laundry, because [he] could sit" while doing it; and his children helped with yard maintenance.  [*Id.* at 49–50].  Plaintiff further stated that his primary care physician recommended that Plaintiff elevate his legs and feet while sitting, and although the physician did not specify an elevation height, Plaintiff would "put them up to where it looks like [he was] sitting on the ground, . . . in a 90-degree angle."  [*Id.* at 50].  In addition, although medical records from March 2021 indicated that Plaintiff smoked a half

pack of cigarettes daily, Plaintiff testified that he had quit smoking as of June 2020. [*Id.* at 50–51]; *see also* [Doc. 8-8 at 680]. He also used two liters of supplemental oxygen at night with a BiPAP machine, and would carry "portable bottles for when [he was] out and about for emergency usage," but no doctor had suggested that Plaintiff required oxygen 24/7. [Doc. 8-2 at 51–52]. Plaintiff testified that he was able to drive to the grocery store and to his medical appointments, and his hobbies included talking, writing, and drawing, but he was unable to do "the stuff [he] used to like to do . . . because of the lung disease" and exposure to fumes, such as fabricating and welding. [*Id.* at 52–54].

With respect to work activities, Plaintiff stated that he did not feel he "could do even a sit-down type job" because his legs would swell and feet would start hurting. [*Id.* at 59]. Plaintiff also testified that he was "[s]omewhat" limited in terms of how long he could stand: "If I'm standing for too long, my legs start aching. It feels like they're going to go out from under me. My feet feel like they're, like if you sleep on your hand and it goes either tingling, when you move your hand it tingles, that's what I feel all of the time in my feet." [*Id.*]. Plaintiff specified that he could stand for a maximum of 20 minutes before his feet would start to hurt, and he would lie down "a couple times a day" because of pain in his chest and feet, typically for 30 to 45 minutes. [*Id.* at 60–61]. Plaintiff further testified that he was not limited in terms of how much weight he could carry. [*Id.* at 60].

Moreover, Plaintiff stated that his headaches would worsen when he bent over, [*id.* at 59], and it felt like the pressure in his head would increase tenfold. [*Id.* at 61]. In addition, his headaches affected his mood, including making him "super irritable," and bright lights would make the headaches worse. [*Id.* at 59, 61–62]; *see also* [*id.* at 74–75 ("I'm always in a bad mood, so I just started avoiding people. It always looks like I'm in a frumpy mood, but I'm not, I've just

4

always got a migraine. . . .  [I]t makes it difficult to be able to enjoy my family, my kids. . . . It's just my, my days are constant headaches, pressure in the back of my head 24/7 . . . I can't get to words now to actually describe it, but it's . . . irritating.")].

Plaintiff further testified that he would get winded and lose his breath when climbing stairs, but he "could usually get up a couple flights" if he took his time.  [*Id.* at 61].  And he would get lightheaded and "dizzy sometimes" such that he needed to sit down because he felt like he was "going to fall down."  [*Id.*].  In addition, Plaintiff stated that certain fumes or odors made breathing difficult: "I start coughing because of certain smells, like perfumes, cleaning chemicals really-really affect me."  [*Id.* at 62].

Following Plaintiff's testimony, the VE summarized Plaintiff's work history, identifying Plaintiff's past relevant positions as (1) garage door technician, (2) transfer driver, (3) iron worker, (4) janitor, and (5) appliance repair person.  [*Id.* at 68].  The VE also answered three hypotheticals from the ALJ regarding types of work individuals similarly situated to Plaintiff could perform. *See* [*id.* at 69–71].

For the first hypothetical, the ALJ asked the VE to consider a person of Plaintiff's age, education, and past work experience who can perform work at the light exertional level (i.e., occasionally lift and carry up to 20 pounds, and frequently lift and carry up to 10 pounds); sit for approximately six hours in an eight-hour day; occasionally climb ramps and stairs; never climb ladders, ropes, or scaffolds; occasionally balance; frequently stoop, crouch, kneel, and crawl; occasionally reach overhead bilaterally; occasionally be exposed to extreme cold and heat, fumes, odors, and/or irritants; tolerate moderate noise levels; and must avoid bright lights (i.e., lighting in excess of that provided in retail and office settings).  [*Id.* at 69].  The VE stated that such a person could not perform any of Plaintiff's past work, but identified three light jobs in the national

economy that such a person could perform: (1) electronics worker, with 48,000 positions available; (2) circuit board assembler, with 39,000 positions available; and (3) electrode cleaner, with 37,000 positions available. [*Id.* at 69–70]. For the second hypothetical, the ALJ referred to the first hypothetical individual and changed the following limitations: such an individual could stand and walk up to four hours in an eight-hour day, and frequently stoop, crouch, kneel, and crawl. [*Id.* at 70]. In response to the ALJ's question whether these changes had any impact on the three jobs identified by the VE, the VE responded that "[t]hose jobs would remain at the same numbers" given that they are "seated light type of jobs." [*Id.*]. For the third hypothetical, the ALJ added that "this individual must be allowed to elevate his legs to footstool height, defined as a height that would not interfere with workstation, whenever sitting." [*Id.*]. In response, the VE stated that this additional limitation would not erode or eliminate the three jobs the VE identified. [*Id.* at 70–71].

The VE also testified that generally, for unskilled work, being off task for 15 percent or more of the workday would preclude fulltime competitive work; and "[i]f a person misses more than one to two days per month on a month-to-month basis, that will all by itself preclude[] fulltime competitive work." [*Id.* at 71]. Relatedly, the VE stated that most workplaces provide two 15-minute breaks and a 30- or 60-minute lunch, and exceeding a 30-minute lunch break on a regular basis would preclude fulltime work. [*Id.* at 71–72]. In addition, the VE testified that his testimony was consistent with the Dictionary of Occupational Titles ("DOT") and Selected Characteristics of Occupations as defined in the revised DOT ("SCO"), but he also "use[d] [his] work experience" in six different areas: overhead reaching, bright lights, elevating legs footstool height, the percentage of time being off task, absenteeism, and extra breaks. [*Id.* at 72].

Following the ALJ's questions, Plaintiff's attorney posed additional hypotheticals to the VE. Plaintiff's attorney referenced the ALJ's first hypothetical individual but changed the

exertional limit to sedentary and added that "the individual would need to elevate their legs to waist height when seated." [*Id.* at 72–73]. The VE responded by identifying three "sedentary jobs that fit that hypothetical": (1) final assembler, eyeglass assembler, with 58,000 jobs; (2) touchup inspector in the semiconductor industry, with 41,000 jobs; and (3) dowel inspector, with 37,000 jobs. [*Id.* at 73]. The VE also testified that leg elevation would not be a considered a special accommodation for these jobs. [*Id.*]. The VE further testified that, based on his experience, fulltime work would be precluded if that same hypothetical individual required at least one additional break during the workday to lie down for 45 minutes. [*Id.* at 73–74].

***The Hearing Decision.*** On August 6, 2021, the ALJ issued a decision denying Plaintiff's claim. [*Id.* at 12–26]. The ALJ determined that Plaintiff met the insured status requirements of the Act through December 31, 2023, and had not engaged in substantial gainful employment since January 3, 2020. [*Id.* at 17]. At Step Two, the ALJ found that Plaintiff had the following severe impairments: obstructive sleep apnea ("OSA"), degenerative disc disease ("DDD") of the cervical spine, chronic kidney disease stage III, hypertension, chronic obstructive pulmonary disease ("COPD"), Chiari malformation, and obesity. [*Id.* at 18].

At Step Three, the ALJ determined that Plaintiff does not have an impairment or combination of impairments that meets or equals the severity of one of the listed impairments in the Social Security regulations ("Regulations"). [*Id.* at 18].[6] At Step Four, the ALJ concluded that Plaintiff has the residual functional capacity to perform a range of light work, but with the following limitations:

> [C]laimant can occasionally [lift] and carry 20 pounds, frequently 10 pounds. He can sit for approximately six hours in an eight-hour day, and he can stand and walk for approximately four hours in an eight-hour day. The claimant can occasionally

---

[6] The ALJ states that he considered Plaintiff's impairments under "listings 1.1.5, 3.02, 3.09, 4.02, 11.05, and 13.21." [Doc. 8-2 at 18].

climb ramps and stairs, never climb ladders, ropes, or scaffolds, occasionally balance as part of his job requirements, and he can occasionally stoop, crouch, kneel, and crawl. He can occasionally reach overhead bilaterally. He needs to have only occasional exposure to extremes of cold or heat and occasional exposure to fumes, odors, and/or irritants. The claimant can tolerate moderate levels of noise. He needs to avoid bright lights that would be lights in excess of retail and office type lighting. The claimant must be allowed to elevate his legs to footstool height, defined as a height that would not interfere with workstation whenever sitting.

[*Id.* at 18]. Although the ALJ determined that Plaintiff was incapable of performing any of his past relevant work, at Step Five, the ALJ found "there are jobs that exist in significant numbers in the national economy" that Plaintiff could perform—namely, (1) electronics worker (48,000 jobs nationwide), (2) circuit board assembler (39,000 jobs nationwide), and (3) electrode cleaner (37,000 nationwide). [*Id.* at 24–25]. As a result, the ALJ determined that Plaintiff was not disabled. [*Id.* at 26].

Plaintiff filed a Request for Review of the Hearing Decision on August 6, 2021, which the Appeals Council denied on February 11, 2022. [Doc. 10-2 at 1–5]. The Appeals Council determined that the additional evidence that Plaintiff provided—specifically, "records from Pueblo Community Health Center, dated May 10, 2021 through July 27, 2021"—did "not show a reasonable probability that it would change the outcome of the decision." [*Id.* at 2].

Plaintiff sought judicial review of the Commissioner's final decision in the United States District Court for the District of Colorado on March 23, 2022, invoking this Court's jurisdiction to review the Commissioner's final decision under 42 U.S.C. §§ 405(g) and §1383(c)(3). *See* [Doc. 1].[7] Because this matter is ripe for consideration, the Court considers the Parties' arguments below.

---

[7] On August 11, 2022, this civil action was reassigned to Judge Nina Y. Wang the upon her appointment as a United States District Judge. *See* [Doc. 13].

**LEGAL STANDARD**

An individual is eligible for DIB under the Act if they are insured, have not attained retirement age, have filed an application for DIB, and have a disability as defined in the Act.  *See* 42 U.S.C. § 423(a)(1).  Similarly, SSI is available to an individual who is financially eligible, files an application for SSI, and is disabled as defined in the Act.  *See id.* § 1382.  For DIB, the claimant must prove they were disabled prior to last date insured.  *Flaherty v. Astrue*, 515 F.3d 1067, 1069 (10th Cir. 2007).  On the other hand, the earliest a claimant can receive SSI is the month following the month within which the claimant filed his application, and thus the claimant must establish that he was disabled on or prior to his application date.  *See* 20 C.F.R. §§ 416.200, 416.335; *see also id.* § 416.912(b)(1) ("Before we make a determination that you are not disabled, we will develop your complete medical history for at least the 12 months preceding the month in which you file your application").

Under the Act, an individual is disabled "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work."  42 U.S.C. § 423(d)(2)(A).  The disability must last or be expected to last for at least 12 months.  *Id.* § 423(d)(1)(A).  When a claimant has one or more physical or mental impairments, the Commissioner must consider the combined effects in making a disability determination.  *Id.* at § 423(d)(2)(B).

Under the Act, there is a five-step evaluation process to determine whether a claimant is disabled:

1.  Whether the claimant has engaged in substantial gainful activity;

2.  Whether the claimant has a medically severe impairment or combination of impairments;

3.  Whether the claimant has an impairment that meets or medically equals any listing found at Title 20, Chapter III, Part 404, Subpart P, Appendix 1;

4.  Whether the claimant has the Residual Functional Capacity ("RFC") to perform her past relevant work; and

5.  Whether the claimant can perform work that exists in the national economy, considering the claimant's RFC, age, education, and work experience.

*See* 20 C.F.R. §§ 404.1520(a)(4)(i)–(v), 416.920(a)(4)(i)–(v); *see also Williams v. Bowen*, 844 F.2d 748, 750–52 (10th Cir. 1988) (describing five steps in detail). "The claimant bears the burden of proof through step four of the analysis[,]" and the Commissioner bears the burden of proof at step five. *Neilson v. Sullivan*, 992 F.2d 1118, 1120 (10th Cir. 1993). If an ALJ determines "at any of the steps that a claimant is or is not disabled, evaluation under a subsequent step is not necessary." *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007) (internal quotation marks omitted).

In reviewing the Commissioner's decision, the Court limits its review to considering whether the ALJ's findings are supported by substantial evidence and if they applied the correct legal standards. *Flaherty*, 515 F.3d at 1069. The Court may not reweigh evidence nor substitute judgement for the Commissioner's, but failure to apply proper legal standards may be sufficient grounds for reversal independent of substantial evidence analysis. *Hendron v. Colvin*, 767 F.3d 951, 954 (10th Cir. 2014). Substantial evidence is more than a "mere scintilla" and is such relevant evidence that a reasonable mind might accept as adequate to support the conclusion. *Flaherty*, 515 F.3d at 1069. Evidence is not substantial if it is overwhelmed by the record or is only a conclusion. *Williams*, 849 F.2d at 750. The Court may not replace the Commissioner's decision

between two plausible and conflicting views, even if the Court would find differently in a *de novo* review.  *Lax*, 489 F.3d at 1084.  However, the Court must "meticulously examine the record as a whole, including anything that may undercut or detract from the ALJ's findings in order to determine if the substantiality test has been met."  *Grogan v. Barnhart*, 399 F.3d 1257, 1262 (10th Cir. 2005).

## ANALYSIS

Plaintiff identifies four overall issues in the ALJ's decision which he argues warrant remand.  *See* [Doc. 10 at 6–7].  First, Plaintiff argues that the ALJ failed to properly evaluate the medical opinion evidence, thereby committing reversible error at Steps Four and Five.  [*Id.* at 6, 28–32].  Second, Plaintiff claims that the ALJ erred at Step Five by finding that Plaintiff "could perform occupations that are inconsistent with his" RFC, but "failed to reconcile that discrepancy" in violation of Social Security Ruling ("SSR") 00-4p.  [*Id.* at 6, 33–35].  Third, Plaintiff asserts that the ALJ failed to properly consider whether Plaintiff's headache disorder was severe and medically equaled a Listing under the Regulations, and failed to "include sufficient limitations in the RFC findings to account for this impairment."  [*Id.* at 7, 35–40].  Fourth, Plaintiff contends that the ALJ erred in his credibility determination and did not properly assess the consistency of Plaintiff's statements regarding his impairments against the other evidence in the record.  [*Id.* at 7, 40–46].  In the Response, the Commissioner disagrees with Plaintiff, insisting that substantial evidence supports the ALJ's decision, and the ALJ properly considered all such evidence.  *See* [Doc. 11].  As explained in greater detail below, the Court finds that the ALJ's determination was supported by substantial evidence.  The Court will address each of Plaintiff's arguments, but following the sequential five-step analysis, rather than in the order that Plaintiff raised them in his Opening Brief.

## I.     Whether the ALJ Erred in His Analysis of Plaintiff's Headache Disorder.

Plaintiff argues that the ALJ failed to properly evaluate his headache disorder under Steps Two and Three of the sequential evaluation.  [Doc. 10 at 35–40].  Specifically, Plaintiff contends that "[t]he ALJ failed to comply with the Commissioner's policy for the evaluation of headache disorders in Social Security Ruling 19-4p."  [*Id.* at 35].

### A.     Legal Framework

At Step Two the Commissioner determines whether a claimant has any severe physical or mental impairments.  *See Williams*, 844 F.2d at 750.  An impairment is "severe" if it "significantly limits" a claimant's "physical or mental ability to do basic work activities," 20 C.F.R. §§ 404.1520(c), 416.920(c), such as walking, standing, sitting, seeing, hearing, speaking, carrying out simple instructions, using judgment, responding appropriately to supervision or coping with changes in routine.  20 C.F.R. §§ 404.1522(b), 416.922(b).  But "the claimant must show more than the mere presence of a condition or ailment."  *Hinkle v. Apfel*, 132 F.3d 1349, 1352 (10th Cir. 1997).  Indeed, an ALJ may conclude that an ailment is not a medically determinable impairment— a particularly important finding, as the ALJ must consider only *medically determinable impairments* (severe or not) at subsequent steps.  *See Cook v. Colvin*, No. CV 15-1164-JWL, 2016 WL 1312520, at *4 (D. Kan. Apr. 4, 2016) ("Limitations attributed to impairments which are medically determinable but are not severe must be considered at later steps in the evaluation, whereas alleged limitations attributable to impairments which are not medically determinable must not be considered at later steps.") (emphasis omitted).

At Step Three, the Commissioner "determines whether the impairment is equivalent to one of a number of listed impairments that the Secretary acknowledges are so severe as to preclude substantial gainful activity," pursuant to 20 C.F.R. §§ 404.1520(d) and 416.920(d).  *Williams*, 844 F.2d at 751.  "If the impairment is listed and thus conclusively presumed to be disabling, the

claimant is entitled to benefits.  If not, the evaluation proceeds to the fourth step, where the claimant must show that the impairment prevents him from performing" his past work.  *Id.* (citations, brackets, and quotations omitted).

### B.    Application

Here, the ALJ concluded at Step Two that Plaintiff has the severe impairments of OSA, DDD of the cervical spine, chronic kidney disease stage III, hypertension, COPD, Chiari malformation, and obesity.  [Doc. 8-2 at 18].  At Step Three, the ALJ determined that Plaintiff "does not have an impairment or combination of impairments that medically equals the severity of one of the listed impairments" under the Regulations.  [*Id.*].

On appeal, Plaintiff alleges that the ALJ failed to consider whether his "headache disorder was a medically determinable impairment, or whether or not it was severe" under SSR 19-4p. [Doc. 10 at 36].  According to Plaintiff, SSR 19-4p "[1] directs how to determine whether a primary headache disorder is a medically determinable severe impairment at Step Two and [2] instructs that while there is no Listing for these disorders, they are best assessed at Step Three under a 'medical equivalency' standard using Listing 11.02, the Listing for seizure disorders."  [*Id.* at 35]. Thus, Plaintiff continues, under SSR 19-4p, the ALJ was required to "consider whether or not [his] headache disorder was a medically determinable impairment, or whether or not it was severe," but he "failed to provide any discussion at all of this disorder in his . . . Step Two findings."  [*Id.* at 36].  Plaintiff also claims that the ALJ erred at Step Three by failing to assess whether his headache disorder "medically equaled any [l]isting."  [*Id.*].

The Commissioner responds that SSR 19-4p addresses the ALJ's evaluation of *primary* headache disorders, and "[b]ecause Plaintiff did not have a primary headache disorder, the ALJ did not err in not analyzing his headaches under SSR 19-4p" at Step Two.  [Doc. 11 at 8–9].  The

Commissioner also asserts that the ALJ was not required to discuss Plaintiff's headache disorder under Step Three because the remainder of the ALJ's decision sufficiently explains his rationale as to why he did not find Plaintiff's headache impairment medically equaled a listed impairment. [*Id.* at 9–11 (citing SSR 17-2p, 2017 WL 3928306 (Mar. 27, 2017))]. The Court finds that the ALJ did not commit reversible error at Steps Two or Three.

First, the ALJ was not required to evaluate Plaintiff's headache impairment at Step Two because he found other severe impairments at that stage of the sequential evaluation process. Thus, any such error in this regard is harmless. In *Allman v. Colvin*, the United States Court of Appeals for the Tenth Circuit ("Tenth Circuit") explained that at Step Two "a claimant need only establish, and an ALJ need only find, one severe impairment[,]" as a finding of one severe impairment requires the ALJ to proceed to the next step considering *all* of the claimant's ailments (severe or not) anew. 813 F.3d 1326, 1330 (10th Cir. 2016). "Thus, the failure to find a particular impairment severe at [S]tep [T]wo is not reversible error when the ALJ finds at least one other impairment is severe." *Id.*; *see also Smith v. Colvin*, 821 F.3d 1264, 1266–67 (10th Cir. 2016) (holding as harmless error the ALJ's failure to find a severe left shoulder impairment at Step Two when the ALJ considered shoulder impairments in assessing the plaintiff's RFC); *Howard v. Berryhill*, No. 17-cv-00276-RBJ, 2017 WL 5507961, at *4 (D. Colo. Nov. 17, 2017) ("While it certainly would have been prudent for the ALJ to consider Ms. Howard's chronic pain syndrome diagnosis at [S]tep [T]wo . . . the ALJ's failure to do so is not reversible error under *Allman* because she determined that two of Ms. Howard's other impairments were severe."). Here, the ALJ found that Plaintiff had seven severe physical impairments, *see* [Doc. 8-2 at 18], and then he "proceeded with the analysis as required." *Troe v. Berryhill*, No. 16-cv-02794-MEH, 2017 WL 2333101, at *7 (D.

Colo. May 30, 2017) (relying on *Allman*, 813 F.3d at 1330).  Thus, the ALJ did not err at Step Two by failing to find that Plaintiff's headaches constituted a severe impairment.

Second, the ALJ was not required to evaluate Plaintiff's headache impairment under Step Three given that he did not find this condition to be severe at Step Two; and, as discussed further below, the ALJ's RFC findings accounted for Plaintiff's headaches and provided an adequate basis for upholding his conclusion that Plaintiff's headache impairments did not meet or equal any listed impairment.  *See* [Doc. 8-2 at 23–24]; *Garrison v. Colvin*, 564 F. App'x 374, 377 (10th Cir. 2014) ("[T]he ALJ found at step two that those were nonsevere, thus directing the conclusion that they did not meet a listing at step three."); *Fischer-Ross v. Barnhart*, 431 F.3d 729, 733 (10th Cir. 2005) (holding that "an ALJ's findings at other steps of the sequential process may provide a proper basis for upholding a step three conclusion that a claimant's impairments do not meet or equal any listed impairment").

Moreover, Plaintiff's reliance on SSR 19-4p and Listing 11.02 are misplaced.  Relevant here, SSR 19-4p states that "[p]rimary headaches occur independently and are not caused by another medical condition," whereas "[s]econdary headaches are symptoms of another medical condition, such as fever, infection, high blood pressure, stroke, or tumors."  2019 WL 4169635, at *3.  Under SSR 19-4p, the Commissioner "may establish *only* a primary headache disorder" as a medically determinable impairment and "*will not establish* secondary headaches (for example, headache attributed to trauma or injury to the head or neck or to infection) as [medically determinable impairments] because secondary headaches are symptoms of another underlying medical condition."  *Id.* at *5 (emphasis added).  SSR 19-4p also notes that "[p]rimary headache disorder is not a listed impairment under the Listing of Impairments"; however, the Commissioner "may find that a primary headache disorder, alone or in combination with another impairment(s),

medically equals a listing." *Id.* at *7. It further states that the "most closely analogous listed impairment" for a medically determinable impairment of primary headache disorder is epilepsy under Listing 11.02. *Id.*

On appeal, Plaintiff insists that evidence in the record "establishes the existence of *primary* headache disorder as a medically determinable impairment under the terms of SSR 19-4p." [Doc. 10 at 37–38 (emphasis added)]. Plaintiff also contends that the ALJ violated SSR 19-4p by failing to properly consider whether Plaintiff's headache impairment met Listing 11.02, "specifically subparagraphs (B) and (D)" under that listing. [*Id.* at 37]. The Court finds Plaintiff's arguments unpersuasive for at least two reasons.

First, although Plaintiff cites a number of medical records to support his assertion that "[t]he evidence establishes the existence of [a] *primary* headache disorder," [*id.* (citing [Doc. 8-7 at 453–55, 479, 497, 566–69, 623; Doc. 8-8 at 686])], the Court "may not reweigh the evidence." *Hendron*, 767 F.3d at 954.[8]

Second, as the Commissioner points out, SSR 19-4p explains that Paragraphs B and D of Listing 11.02 require "dyscognitive seizures" which must occur once per week or every two weeks. 2019 WL 4169635, at *7. "Dyscognitive seizures are characterized by alteration of consciousness without convulsions or loss of muscle control. During the seizure, blank staring, change of facial expression, and automatisms (such as lip smacking, chewing or swallowing, or repetitive simple

---

[8] Moreover, and without reweighing the evidence, the Court notes that some of the records cited by Plaintiff indicate that Plaintiff's headaches are symptoms of Chiari malformation. *See, e.g.*, [Doc. 8-7 at 623 ("He has a history of migraines due to Arnold-Chiari disease."); Doc. 8-8 at 686 ("Head Pain/Headaches – Chiari Malformation")]; *see also* SSR 19-4p, 2019 WL 4169635, at *5 (stating that the Commissioner "may establish *only* a primary headache disorder" as a medically determinable impairment and "*will not establish* secondary headaches . . . as [medically determinable impairments] because secondary headaches are symptoms of another underlying medical condition").

actions, such as gestures or verbal utterances) may occur."  20 C.F.R. § Pt. 404, subpt. P, app. 1, § F.1.b.  Plaintiff does not dispute that dyscognitive seizures are a requirement under those paragraphs of Listing 11.02.  *Compare* [Doc. 11 at 11] *with* [Doc. 12 at 7–9].  Nor does Plaintiff claim or cite any evidence showing that he experienced dyscognitive seizures during a headache episode.  Instead, Plaintiff insists that dyscognitive seizures are only required to *meet*—but not to *medically equal*—an impairment under Paragraphs B and D of Listing 11.02.  Specifically, although the Commissioner notes the requirement of dyscognitive seizures under Paragraphs B and D of Listing 11.02, including a "loss of consciousness," *see* [Doc. 11 at 11], Plaintiff urges that "[t]he Commissioner is conflating the strict requirements of the Listing when applied to epilepsy and the analysis of whether a headache disorder is 'medically equivalent' to it." [Doc. 12 at 8].  Plaintiff continues that because Listing 11.02 applies specifically to epilepsy, "[a] headache disorder cannot '*meet*' the Listing" and, therefore, "[l]oss of consciousness is . . . not required to find" that his headache disorder is *equivalent to* Listing 11.02.  [*Id.* at 8–9 (emphasis added)].  Significantly, however, Plaintiff fails to cite any authority supporting this argument.  *See* [*id.*].  In any event, the Regulations explain how the Commissioner determines medical equivalence for an impairment:

> If you have an impairment(s) that is not described in [the Listing of Impairments], we will compare your findings with those for closely analogous listed impairments. If the findings related to your impairment(s) are at least of *equal medical significance* to those of a listed impairment, we will find that your impairment(s) is medically equivalent to the analogous listing.

20 C.F.R. §§ 404.1526(b)(2), 416.926(b)(2) (emphasis added).  And Plaintiff fails to explain how the medical findings related to his headaches are at least of "equal medical significance to those of" Listing 11.02 under Paragraphs B and D.  *See* [Doc. 12 at 8–9].  In sum, the Court finds that the ALJ did not commit reversible error in his evaluation of Plaintiff's headache impairment at Steps Two and Three of the sequential evaluation.

**II.     Whether the ALJ Properly Considered the Medical Opinion Evidence.**

Plaintiff claims that the ALJ failed to properly consider the medical opinion evidence at Steps Four and Five of the sequential evaluation.  The Court will address each challenge in turn.

**A.     Step Four**

Plaintiff argues that the ALJ erred in his evaluation of Plaintiff's RFC at Step Four when he "based his finding on the opinion of medical sources whose opinions were stale by the time of his decision" and "without explanation, cherry-picked those opinions to exclude limitations that would have required a finding of disability."  [Doc. 10 at 6].

***Legal Standard.***  In formulating a claimant's RFC, the ALJ must consider the combined effect of all the claimant's medically determinable impairments, including the severe and non-severe.  *See Wells v. Colvin*, 727 F.3d 1061, 1065 (10th Cir. 2013); *Ray v. Colvin*, 657 F. App'x 733, 734 (10th Cir. 2016).  A claimant's RFC is the most work the claimant can perform, not the least.  20 C.F.R. §§ 404.1545, 416.945.  "The RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)."  *Hendron v. Colvin*, 767 F.3d 951, 954 (10th Cir. 2014) (citation and quotation marks omitted).  The ALJ need not identify "affirmative, medical evidence on the record as to each requirement of an exertional work level before an ALJ can determine RFC within that category," and the Court will uphold the RFC assessment if it is consistent with the record and supported by substantial evidence.  *See Howard v. Barnhart*, 379 F.3d 945, 947, 949 (10th Cir. 2004).

In assessing a claimant's RFC, the ALJ must address the record's medical source opinions.  *See Vigil v. Colvin*, 805 F.3d 1199, 1201–02 (10th Cir. 2015).  For applications filed after March 27, 2017, the Regulations provide that an ALJ must evaluate the persuasiveness of a medical opinion using the following factors: (1) supportability; (2) consistency; (3) the provider's

relationship with the claimant, including the length of the treatment relationship, frequency of examinations, purpose of the treatment relationship, and extent of the treatment relationship, and whether the treatment relationship is an examining relationship; (4) the medical source's area of specialization; and (5) other factors "tending to support or contradict a medical opinion or prior administrative medical finding." 20 C.F.R. § 404.1520c(c); *Pearson v. Saul*, No. 20-cv-01808-NRN, 2021 WL 2549214, at *3 (D. Colo. June 22, 2021).

The Regulations provide that supportability and consistency "are the most important factors" in determining the persuasiveness of a medical opinion. 20 C.F.R. § 404.1520c(b)(2). While the ALJ must explain his approach to these two factors, he need not expound on the remaining three factors unless he finds that two or more non-identical medical opinions are equally well-supported and consistent with the record. *Id.* at § 416.920c(b)(2)–(3); *see also Vellone v. Saul*, 1:20-cv-00261 (RA) (KHP), 2021 WL 319354, at *6 (S.D.N.Y. Jan. 29, 2021). "[A] supportability inquiry examines how well a medical source supported and explained their opinion." *S.P. v. Kijakazi*, No. 20-cv-00717-CMA, 2021 WL 6197283, at *5 (D. Colo. Dec. 30, 2021) (citing *Vellone*, 2021 WL 319354, at *6); *see* 20 C.F.R. § 416.920c(c)(1). "Consistency, on the other hand, is 'an all-encompassing inquiry' that focuses on how well a medical source opinion is supported, or not supported, by the entire record." *Id.* (citation omitted); *see also* 20 C.F.R. § 416.920c(c)(2). At bottom, the ALJ must "consider all evidence in [the] case record when [making] a determination or decision whether [the claimant] is disabled." 20 C.F.R. § 404.1520(a)(3). This means that in addition to discussing supporting evidence, the ALJ must "discuss the uncontroverted evidence he chooses not to rely upon, as well as significantly probative evidence he rejects." *Mestas v. Kijakazi*, No. 20-cv-01865-REB, 2021 WL 3030224, at *3 (D. Colo. July 19, 2021) (quoting *Clifton v. Chater*, 79 F.3d 1007, 1009 (10th Cir. 1996)).

***The ALJ's RFC Finding and Rationale.***   As mentioned above, the ALJ concluded that Plaintiff retains the RFC to perform light work with the following limitations:

> [C]laimant can occasionally [lift] and carry 20 pounds, frequently 10 pounds.  He can sit for approximately six hours in an eight-hour day, and he can stand and walk for approximately four hours in an eight-hour day.  The claimant can occasionally climb ramps and stairs, never climb ladders, ropes, or scaffolds, occasionally balance as part of his job requirements, and he can occasionally stoop, crouch, kneel, and crawl.  He can occasionally reach overhead bilaterally.  He needs to have only occasional exposure to extremes of cold or heat and occasional exposure to fumes, odors, and/or irritants.  The claimant can tolerate moderate levels of noise.  He needs to avoid bright lights that would be lights in excess of retail and office type lighting.  The claimant must be allowed to elevate his legs to footstool height, defined as a height that would not interfere with workstation whenever sitting.

[Doc. 8-2 at 18].  Relevant here, in reaching this RFC finding, the ALJ relied on Plaintiff's medical records and the prior administrative medical findings of Glenn Gade, M.D. ("Dr. Gade") and Paul Barrett, M.D. ("Dr. Barrett"), the opinions of whom the ALJ found "persuasive." [*Id.* at 18–23]. Dr. Gade and Dr. Barrett provided their opinions in June 2020 and December 2020, respectively. *See* [Doc. 8-3 at 134–36, 164–67].  Those doctors opined, *inter alia*, that Plaintiff could perform light work with the following limitations: he could only stand and/or walk for four hours in an eight-hour workday; frequently balance, stoop, kneel, crouch, and crawl; occasionally climb ramps and stairs; never climb ladders, ropes, or scaffolds; avoid concentrated exposure to extreme cold, extreme heat, and noise; and "[a]void even moderate exposure" to "[f]umes, odors, dusts, gases, poor ventilation, etc.," and hazards. [*Id.* at 134–36, 146–47, 164–67, 180–83].  In relying on those opinions, the ALJ explained that Drs. Gade and Barrett "supported their prior administrative findings with reference to the claimant's medical records," and "evidence of the claimant's swelling on some exams, decreased breath sounds, and reports of headache pain is consistent with the doctors' prior administrative findings." [Doc. 8-2 at 23].

***Plaintiff's Challenges on Appeal.***   Plaintiff argues that the ALJ should not have relied on the opinions of Drs. Gade and Barrett because "much of the medical information in the record"

when the ALJ rendered his decision was not in the record when the doctors signed their opinions. [Doc. 10 at 29–30]. Specifically, after Drs. Gade and Barrett provided their opinions, Plaintiff submitted additional medical records from dates ranging from June 2020 to June 2021. *See* [*id.* at 30 n.8 (citing [Doc. 8-7 at 645 to Doc. 8-8 at 857])]. According to Plaintiff, Drs. Gade and Barrett did not review evidence showing that:

> [Plaintiff's] hypertension was insufficiently controlled, [a] referral for bariatric surgery, ongoing and near-constant edema, prescriptions for Marinol, pain management records showing unsuccessful treatment, worsening pulmonary disease, diagnosis of possible Goodpasture's disease, and increasing need for oxygen even during the day.

[*Id.* at 30 (citations omitted)]. Thus, Plaintiff continues, "[t]he ALJ failed to account for these new signs, symptoms, and conditions in his RFC findings; *specifically, he failed to include any requirement that [Plaintiff] use oxygen during the day*, a factor that would have affected his ability to work in the factory-type occupations cited to deny the claim at Step Five." [*Id.* (emphasis added)]. Plaintiff asserts that Drs. Gade's and Barrett's opinions were "stale by the time the ALJ issued his denial of the claim" and the ALJ, therefore, should have found "the opinions of these non-examining sources . . . less persuasive" because "they did not have a complete record to review and therefore inadequate information on which to base those opinions." [*Id.*].

The Commissioner responds that the ALJ's reliance upon Drs. Gade's and Barrett's opinions is supported by substantial evidence, and the ALJ complied with the Regulations in determining the supportability and consistency between those opinions and Plaintiff's medical records. [Doc. 11 at 11–15]. And because the ALJ found that these opinions were supported by and consistent with the medical record, the Commissioner asserts that the ALJ was not required to consider Plaintiff's newly submitted medical records under the applicable Regulations. [*Id.* at 13–14].

*Application.*   The Court finds no error in the ALJ's RFC finding and rationale.   As a preliminary matter, despite Plaintiff's general claim that the ALJ failed to consider the findings in the more recently submitted medical records, Plaintiff identifies only one specific error: that the ALJ "failed to include any requirement that [Plaintiff] use oxygen during the day."   [Doc. 10 at 30].   Indeed, Plaintiff fails to explain how his post-hearing decision medical records showing his other alleged conditions—i.e., insufficiently controlled hypertension, bariatric surgery referral, edema, Marinol prescriptions, uncontrolled pain management, pulmonary disease, and Goodpasture's disease, [*id.*]—render stale, or are inconsistent with, the opinions of Drs. Gade and Barrett.   *See* [*id.*]; *see also* [Doc. 12 at 6].[9]   Thus, the Court will focus on Plaintiff's allegation that the ALJ failed to include an oxygen use requirement in the RFC.

Here, the ALJ reviewed all of the new evidence Plaintiff submitted, yet still found Dr. Gade's and Dr. Barrett's opinions to be consistent with that new evidence.   *See* [Doc. 8-2 at 22–24].   Indeed, the ALJ accounted for all these records in his decision despite Plaintiff's claims to the contrary.   *See, e.g.*, [*id.* at 30–31].   Although Plaintiff takes issue with the ALJ's "fail[ure] to include any requirement that [Plaintiff] use oxygen during the day," [Doc. 10 at 30], Plaintiff fails to cite any record showing that a medical provider opined that Plaintiff indeed required oxygen during the day.   Rather, Plaintiff points to a record from June 2021 indicating that it was *Plaintiff*, and not his provider, who felt "like he needs oxygen during the daytime."   [Doc. 8-8 at 856]; *see also* [Doc. 10 at 30 (claiming he required an "increasing need for oxygen even during the day" and citing "AR, p. 856")].   The record also noted that Plaintiff's oxygen saturation level was at 90%, [Doc. 8-8 at 856], and the treating provider recommended that Plaintiff use inhalers and a

---

[9] Plaintiff cites to more than 200 pages of additional medical records that were "not in the file at the time of the last of these opinions (Dr. Barrett's)."   [Doc. 10 at 30 n.8].

corticosteroid, and stated that Plaintiff would benefit from the use of a nebulizer, [*id.* at 857].[10] Significantly, the ALJ discussed this exact record in his hearing decision. *See* [Doc. 8-2 at 22 ("In June 2021 . . . [h]e complained he was still short of breath and he felt like he needed oxygen in the day time.")]. Likewise, at the hearing—which occurred *after* Plaintiff's June 2021 appointment— Plaintiff acknowledged that no doctor had recommended that he needed oxygen on a 24/7 basis. [*Id.* at 51]. Under these circumstances, nothing about the new records shows any substantial worsening of Plaintiff's symptoms with respect to his oxygen saturation that the ALJ did not consider in his RFC assessment. Accordingly, "the ALJ did not err in his evaluation of the state agency physicians' opinions." *White v. Kijakazi*, No. 4:20-cv-00119 PK, 2021 WL 5919770, at *5 (D. Utah Dec. 15, 2021) (finding no reversible error where "the ALJ reviewed all of the new evidence yet still found the state agency physicians' opinions to be consistent with that new evidence").[11]

---

[10] At the hearing, Plaintiff testified that he was awaiting his insurance to approve the nebulizer. [Doc. 8-2 at 54–55].

[11] The Commissioner also contends that the ALJ was not required to consider Plaintiff's additional medical records pursuant to 20 C.F.R. § 404.1520c(c)(5), which states in relevant part that:

> We will consider *other factors* that tend to support or contradict a medical opinion or prior administrative finding. . . . When we consider a medical source's familiarity with the other evidence in a claim, *we will also consider whether new evidence we receive after the medical source made his or her medical opinion or prior administrative medical finding makes the medical opinion or prior administrative medical finding more or less persuasive*.

20 C.F.R. § 404.1520c(c)(5) (emphasis added). Based on this language, the Commissioner argues that the additional medical records Plaintiff submitted constitutes an "other factor" that the ALJ was not required to consider because the ALJ found Drs. Gade's and Barrett's opinions were consistent. [Doc. 11 at 13–14]. However, the Court need not consider this argument given that, as discussed above, the ALJ indeed considered Plaintiff's additional medical records. Even so, the Court notes that the Commissioner's position is based on an incomplete reading of that portion of the Regulations. Specifically, the Commissioner rests her argument on the language stating that "we will consider whether new evidence we receive after the medical source made his or her . . .

**B.      Step Five**

Plaintiff also contends that even if the ALJ's reliance on Drs. Gade's and Barrett's opinions was appropriate in reaching his RFC finding, the ALJ failed to include certain nonexertional restrictions those doctors identified—namely, that Plaintiff would need to "avoid even moderate exposure" to fumes, odors, poor ventilation, pulmonary irritants, and hazards. [Doc. 10 at 30–31]; *see also* [Doc. 8-3 at 136, 147, 167, 183]. Plaintiff argues that the ALJ's omission of these limitations constitutes reversible error at Step Five because two out of the three jobs the ALJ identified—electronics worker and circuit board assembler—are incompatible with those nonexertional limitations. [Doc. 10 at 31–32]. Plaintiff likewise insists that despite finding Drs. Gade's and Barrett's opinions persuasive, the ALJ failed to explain why he excluded those restrictions from his RFC finding, and the ALJ was not permitted to selectively rely upon "only those portions [of the opinions] supportive of a finding of non-disability." [*Id.* at 31].

The Commissioner responds that any error in this regard is harmless because the ALJ determined that "Plaintiff could still perform a significant number of jobs in the national economy" that do not involve exposure to pulmonary irritants or hazards—i.e., the electrode cleaner occupation, with 37,000 jobs in the national economy. [Doc. 11 at 14–15]. The Court respectfully agrees with the Commissioner.

For support, the Commissioner cites *Evans v. Colvin*, 640 F. App'x 731 (10th Cir. 2016), wherein the Tenth Circuit stated that it had previously recognized in another decision, *Trimiar v. Sullivan*, 966 F.2d 1326 (10th Cir. 1992), that "there is no bright-line answer to how many jobs

---

prior administrative medical finding makes the medical opinion or prior administrative medical finding more or less persuasive," while ignoring the first part of that sentence—i.e., the condition precedent stating that consideration of such new evidence will occur "*[w]hen we consider a medical source's familiarity with the other evidence in a claim . . .*" 20 C.F.R. § 404.1520c(c)(5) (emphasis added); *see* [Doc. 11 at 13–14].

are enough for a court to say, as a matter of law, the number is significant, but the number appears to be somewhere between 100 . . . and 152,000." *Evans*, 640 F. App'x at 736.  The Tenth Circuit went on to find that "the Commissioner was substantially justified in arguing that 18,831 remaining jobs in the national economy was sufficient for applying harmless error" in that case.  *Id.* at 736–37.  Plaintiff, for his part, contends that "*Evans* does not support the Commissioner's argument, because . . . that case concerns a plaintiff's request for attorney's fees under the Equal Access to Justice Act (EAJA), . . . after the Commissioner lost the same 'harmless error' argument [s]he asserts in this case."  [Doc. 12 at 5].  According to Plaintiff, the "*Evans* court found that the Commissioner's harmless error argument was 'substantially justified' [only] to the extent he could avoid paying [attorney's] fees for asserting it, [but] in the underlying decision on the merits, the U.S. District Court found that the error itself was harmful error, citing *Chavez v. Barnhart*, 126 [F. App'x 434, 436 (10th Cir. 2005)]."  [*Id.*].  Plaintiff further notes that the *Chavez* court, in turn, "could not determine whether 49,957 jobs was significant or not without engaging in impermissible *post hoc* justification."  [*Id.*].

The Court is respectfully unpersuaded by Plaintiff's argument.  Although Plaintiff is correct that *Evans* concerned a plaintiff's request for attorney's fees under the EAJA,[12] the Court disagrees that its analysis lacks applicability to the facts of this case.  In *Evans*, the plaintiff argued that the Commissioner was "improperly attempt[ing] to salvage the ALJ's decision post hoc." *Evans*, 640 F. App'x at 735.  The court explained that, in the plaintiff's view,

> *Trimiar*'s refusal to draw a bright line regarding what constitutes a significant number of jobs mean[t] that, except when there are more than one million

---

[12] "Under EAJA, a party other than the United States who prevails on judicial review of federal agency action is entitled to attorney fees and other expenses unless, among other things, 'the court finds that the position of the United States was substantially justified.'" *Evans*, 640 F. App'x at 731, 733 (citing 28 U.S.C. § 2412(d)(1)(A)).

> remaining jobs (as in *Raymond*),[13] an ALJ must make the determination, not a court. And because the number of jobs here was much smaller, it was unreasonable for the Commissioner to advance the harmless-error argument.

*Id.* That argument is similar to Plaintiff's position here. *See* [Doc. 12 at 5 ("As in *Evans* and *Chavez*, the Court should decline the Commissioner's invitation in this case to provide the missing finding (i.e., whether or not 37,000 jobs is a significant number).")]. However, the *Evans* court explained—and Plaintiff does not dispute—that "there is no per se barrier to applying harmless error where . . . a court has decided that an ALJ erroneously included one or more jobs and is left with the remaining jobs a claimant can perform with [his] residual functional capacity." *Evans*, 640 F. App'x at 735–36. Significantly, despite Plaintiff's assertion that the *Chavez* court "could not determine whether 49,957 jobs was significant or not without engaging in impermissible *post hoc* justification," [Doc. 12 at 5], the *Evans* court noted that "a close reading of *Chavez* suggests it was the extremely low number of jobs in Oklahoma (199) that drove [the Tenth Circuit's] reluctance to find harmless error" in that case. *Evans*, 640 F. App'x at 736; *see Chavez*, 126 F. App'x at 436 (stating that leaving the significant-number question for the ALJ "is particularly appropriate where . . . the number of jobs *in the region* is relatively small—199" (emphasis added)). Thus, Plaintiff's reliance on *Chavez* is misplaced.[14]

Plaintiff also asserts that the Court should "follow the example" set forth in *Terry T. v. Saul*, No. 19-CV-0684-CVE-CDL, 2021 WL 981284, at *1 (N.D. Okla. Mar. 16, 2021), wherein the United States District Court for the Northern District of Oklahoma ("Oklahoma Northern District Court") "remanded to determine if 108,000 jobs was a significant number." [Doc. 12 at

---

[13] *Raymond v. Astrue,* 621 F.3d 1269 (10th Cir. 2009).

[14] In addition, *Chavez* "was decided before *Raymond* [*v. Astrue*] clarified 'that the relevant test is *either* jobs in the regional economy or jobs in the national economy,' although generally the focus is on the national economy." *Evans*, 640 F. App'x at 736 (citing *Raymond*, 621 F.3d at 1274 n.2)).

5–6].   The   Court   respectfully   declines   Plaintiff's   invitation   for   similar   reasons   previously discussed.   Specifically, in *Terry T.*, the Oklahoma Northern District Court found that remand was appropriate based on the Tenth Circuit's statement in *Trimiar* that the determination of significance should be made by the ALJ, not the district court.   *Terry T.*, 2021 WL 981284, at *5; *see also Trimiar*, 966 F.2d at 1330.   However, nearly two decades after *Trimiar*, the Tenth Circuit explained that "*Trimiar* does *not* hold . . . that a court must engage in a factoral analysis when the number of jobs . . . available is . . . much larger" than the 650 to 900 jobs that were identified in *Trimiar*. *Raymond*, 621 F.3d at 1274 n.2.   The number of electrode cleaner jobs at issue here (37,000) is undoubtedly much larger than the 650 to 900 jobs at issue in *Triamar*.   Similarly, for support, the Oklahoma Northern District Court also cited *Allen v. Barnhart*, 357 F.3d 1140, 1144 (10th Cir. 2004).   *Terry T.*, 2021 WL 981284, at *5.   However, the *Allen* court also relied upon *Trimiar* in rejecting the Commissioner's argument that "*one hundred statewide*[] surveillance-monitor jobs . . . constitute[d] 'work which exists in significant numbers' under" the Social Security Act.   *Allen*, 357 F.3d at 1144.   The 100 statewide jobs noted by the *Allen* court bears substantial similarity to the 199 statewide jobs identified in *Chavez*.   *See Chavez*, 126 F. App'x at 436.   And, as discussed above, the *Evans* court noted that "a close reading of *Chavez* suggests it was the extremely low number of jobs in Oklahoma (199) that drove [the Tenth Circuit's] reluctance to find harmless error" in that case.   *Evans*, 640 F. App'x at 736; *see also Chavez,* 126 F. App'x at 436 (stating that leaving the significant-number question for the ALJ "is particularly appropriate where . . . the number of jobs *in the region* is relatively small—199" (emphasis added)); *Murray v. Berryhill*, CV 17-1086-JWL, 2018 WL 2159788, at *5 (D. Kan. May 10, 2018) (finding no error where the ALJ determined that the plaintiff was not disabled based on the finding that she could perform two occupations consisting of 6,000 jobs nationally).

In sum, the Court finds that the 37,000 electrode cleaner jobs sufficiently meets the Commissioner's burden at Step Five, and therefore finds no reversible error in this regard. *See Garcia v. Saul*, No. 18-cv-00917-REB, 2019 WL 3802105, at *4 (D. Colo. Aug. 13, 2019) (finding that 24,000 jobs "undoubtedly is more sufficient to meet the Commissioner's burden, and [the] plaintiff does not specifically argue otherwise").

## III.   Whether the ALJ Properly Considered Plaintiff's Credibility.

When analyzing a claimant's statements of pain and symptoms, courts must consider (1) whether the claimant established a pain-producing impairment by objective medical evidence; (2) if so, whether there is a loose nexus between the proven impairment and the claimant's subjective allegations of pain; and (3) if so, whether, considering all the evidence, both objective and subjective, the claimant's pain is in fact disabling. *Wilson v. Astrue*, 602 F.3d 1136 (10th Cir. 2010).   In determining whether a claimant's subjective complaints of pain are credible, the Regulations provide that an ALJ may consider the following factors:

(i)      daily activities;

(ii)     the location, duration, frequency, and intensity of pain or other symptoms;

(iii)    precipitating and aggravating factors;

(iv)    the type, dosage, effectiveness, and side effects of any medication taken to alleviate pain or other symptoms;

(v)     treatment, other than medication, received for relief of pain or other symptoms;

(vi)    any measures used to relieve pain or other symptoms; and

(vii)   other factors concerning functional limitations and restrictions due to pain or other symptoms.

20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3).  Moreover, this Court is guided by the principle that "[c]redibility determinations are peculiarly the province of the finder of fact, and [the Court] will not upset such determinations when supported by substantial evidence." *Kepler v. Chater*, 68 F.3d

387, 391 (10th Cir. 1995) (internal quotation and citation omitted).  In addition, "[f]indings as to credibility should be closely and affirmatively linked to substantial evidence and not just a conclusion in the guise of findings."  *Id*.  "Inconsistencies are a reasonable basis upon which to find a claimant not credible."  *Marchand v. Colvin*, No. 14-cv-02533-RM, 2016 WL 1089740, at *8 (D. Colo. Mar. 21, 2016) (citing *Wilson*, 602 F.3d at 1146).  Under Tenth Circuit precedent, "[t]he only question this court must answer is whether the ALJ's [credibility] determination . . . [was] closely and affirmatively linked to evidence that a reasonable mind might accept as adequate to support that conclusion."  *Stokes v. Astrue*, 274 F. App'x 675, 686 (10th Cir. 2008) (declining to adopt a bright-line rule that an ALJ must consider a good work history in the credibility determination).

Here, the ALJ found that Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms," but determined that Plaintiff's "statements concerning the intensity, persistence, and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record."  [Doc. 8-2 at 19].  On appeal, Plaintiff argues that the ALJ's finding regarding the consistency of Plaintiff's statements is not based in substantial evidence, and his rationale is invalid under either SSR 16-3p or 20 C.F.R. § 404.1529(c)(3).  [Doc. 10 at 40].  Specifically, Plaintiff takes issue with the ALJ's rejection of Plaintiff's statements regarding (1) his alleged need to "elevate his legs to at least 90°"; (2) his headaches; (3) his cervical spine pain; and (4) his prior history of smoking.  [*Id.* at 41–46].  Plaintiff also contends that "the ALJ failed to consider evidence that enhanced the consistency of [Plaintiff's] statements, including his good work history in heavy labor jobs and his unrelenting attempts to obtain relief from his symptoms including [his] willing[ness] to try multiple medications and see multiple providers."  [*Id.* at 46].  In response, the Commissioner counters that

"[s]ubstantial evidence supports the ALJ's finding that Plaintiff's subjective complaints were inconsistent with the record." [Doc. 11 at 15]; *see also* [*id.* at 15–19]. For the following reasons, the Court respectfully disagrees with Plaintiff. The Court will address each of Plaintiff's issues in turn.

*Plaintiff's Need to Elevate His Legs.* The ALJ's RFC assessment included that Plaintiff "must be allowed to elevate his legs to footstool height, defined as a height that would not interfere with workstation whenever sitting." [Doc. 8-2 at 18]. Plaintiff argues that the ALJ failed to properly consider Plaintiff's testimony that he needed to "elevate his legs to at least 90°," and "[c]ontrary to the ALJ's finding, [Plaintiff's] edema could not be addressed by merely elevating his legs to a vaguely defined 'footstool' height." [Doc. 10 at 41]. Plaintiff also claims that he submitted evidence to support this greater elevation requirement. *See* [*id.* (citing [Doc. 8-2 at 85–89])].

The Court respectfully disagrees with Plaintiff. The only medical record Plaintiff cites regarding his leg elevation does not state that Plaintiff needed to elevate his legs to at least 90° as he claims. Rather, that record reflects that Plaintiff stated that "elevation helps with symptoms," and his provider recommended generally that Plaintiff "[c]ontinue . . . leg elevation," with no specific height indicated. [Doc. 8-2 at 85, 89]. The ALJ was not required to provide greater limitations merely based on Plaintiff's testimony. *See Kepler*, 68 F.3d at 391 ("Findings as to credibility should be closely and affirmatively linked to substantial evidence and not just a conclusion in the guise of findings.").

Plaintiff also contends that elevation of one's legs constitutes an accommodation under the Americans with Disabilities Act ("ADA"), and "[i]f the only way a claimant can be employed is with an accommodation, a finding of disability is required under the Commissioner's own policy."

[Doc. 10 at 42].  Again, the Court respectfully disagrees with Plaintiff.  For support, Plaintiff cites *Cleveland v. Policy Management Systems Corp.*, 526 U.S. 795, 803 (1999).  [*Id.*].  Contrary to Plaintiff's assertion, however, *Cleveland* does not stand for the proposition that a DIB claimant must be found disabled if he requires an accommodation for employment.  In that case, the Supreme Court was called upon to resolve an apparent tension between the Social Security Act and the ADA, and held that a Social Security claim and ADA claim "can comfortably exist side by side."  *Cleveland*, 526 U.S. at 797, 802–06.[15]  Significantly, the Court noted that under the ADA, a qualified individual is one who can "perform the essential functions of her job *with reasonable accommodation*"; but "when the SSA determines whether an individual is disabled . . . it does *not* take the possibility of reasonable accommodation into account."  *Id.* at 803 (internal quotation marks omitted).  As a result, "an ADA suit claiming that the plaintiff can perform her job *with* reasonable accommodation may well prove consistent with an SSDI claim that the plaintiff could not perform her own job (or other jobs) *without* it."  *Id.*  The Court thus finds that

---

[15] In *Cleveland*, the plaintiff sought Social Security benefits after suffering a stroke, but thereafter she returned to work after her condition improved, and she reported the improvement to the SSA. 526 U.S. at 798.  Based on this information, the SSA denied her claim for benefits.  *Id.*  The plaintiff's employer then terminated her based on her condition.  *Id.*  Thereafter, the plaintiff requested that the SSA reconsider her claim for benefits, which was later granted after a hearing. *Id.* at 798–99.  Shortly before she received her benefits, however, the plaintiff filed an ADA claim against her employer, asserting that it failed to reasonably accommodate her disability.  *Id.* at 799. The lower courts found for the employer, concluding that by seeking and receiving Social Security benefits, the plaintiff had conceded total disability, and thus could not perform the essential functions of her job even with reasonable accommodations.  *Id.* at 799–800; *see also id.* at 802 (explaining that the Fifth Circuit "Court of Appeals thought, in essence, that claims under both Acts would incorporate two directly conflicting propositions, namely, 'I am too disabled to work' and 'I am not too disabled to work'").

*Cleveland* is inapplicable to Plaintiff's arguments here regarding his apparent need to elevate his feet to 90° while working.[16]

**_Plaintiff's Headaches and Associated Statements._**   The ALJ found that Plaintiff's allegations regarding his "Chiari malformation and reports of headaches" were "inconsistent with the evidence." [Doc. 8-2 at 19].  For instance, the ALJ noted, *inter alia*, that Plaintiff "rarely received treatment with a neurologist"; he "requested Marinol for his pain, and he became upset when his request was denied"; and "[h]is recent treatment consisted mostly of just conservative pain management, and his neurologic findings were noted to be unremarkable." [*Id.* at 20].  The ALJ also noted that Plaintiff "rarely reported problems so severe that they could not be managed on an outpatient basis, and when he did go to the hospital in June 2021, his workup was unremarkable and the sensory findings were noted to be in an 'odd pattern.'" [*Id.*].  The ALJ further noted that medical records from March 2020 indicated that Plaintiff "was managing his headache pain with NSAIDS, [i]buprofen two to four per week, but mainly with medical marijuana." [*Id.*].

On appeal, Plaintiff contends that the ALJ did not explain how the evidence was inconsistent with his statements regarding his headache pain. [Doc. 10 at 43].  Specifically, Plaintiff asserts that the fact he "sought Marinol for his pain and was upset when it was denied . . . does not demonstrate any inconsistency," and the ALJ failed to mention that "two providers attempted to prescribe Marinol, but it was not approved by [Plaintiff's] insurance company." [*Id.*].  Plaintiff also argues that the ALJ's citation to "unremarkable" neurologic findings failed to

---

[16] Plaintiff also references an Eighth Circuit case for the proposition that it is "faulty" for an ALJ to determine at Step Five "that a person could perform occupations based on the assumption that an employer would be willing to make accommodations under the" ADA. [Doc. 10 at 42–43]. However, Plaintiff provides no further argument in this regard, and the Court finds Plaintiff's assertion meritless in light of Plaintiff's misinterpretation of *Cleveland*, as discussed above.

recognize that "headaches are often not accompanied by observable neurological findings." [*Id.*]. Plaintiff asserts that "[t]he ALJ appears to fault [Plaintiff] [for] failing to follow up with a neurologist, but there is only one reference in the record to the fact that he apparently canceled an appointment." [*Id.*]. In addition, Plaintiff contends that the ALJ's reference to Plaintiff's "odd pattern" of sensory deficits in 2021 "does not detract from his consistency, and the ALJ fails to explain how it would." [*Id.*]. Plaintiff further insists that the ALJ misstated the facts regarding Plaintiff's pain management—in particular, his use of ibuprofen—on the basis that "[i]n actuality, [Plaintiff] cannot take ibuprofen due to his kidney disease and his headache pain was never adequately managed." [*Id.* at 44 (record citation omitted)]. In response, the Commissioner urges that "a reasonable person could agree with the ALJ that Plaintiff['s] course of treatment was inconsistent with his subjective complaints, as he failed to peruse many of his providers' treatment suggestions." [Doc. 11 at 16–17].

The Court finds that the ALJ did not commit reversible error in his evaluation of Plaintiff's statements regarding his headaches. For instance, although Plaintiff argues that his seeking "Marinol for his pain . . . does not demonstrate any inconsistency," [Doc. 10 at 43], the ALJ explained that the record noting this issue also mentioned that Plaintiff admitted that he had not followed up with a neurologist as recommended by his provider. [Doc. 8-2 at 20; *see also* [Doc. 8-7 at 623, 628]. The ALJ also noted, and Plaintiff acknowledges, that Plaintiff had previously cancelled a neurosurgery appointment. [Doc. 8-2 at 20; Doc. 10 at 43]; *see also* [Doc. 8-8 at 697 ("UCH health . . . stated they sent pt for follow-up but pt cancelled and never called to reschedule.")]. In addition, Plaintiff's assertion that the ALJ misstated the facts by referencing Plaintiff's use of ibuprofen lacks basis. *See* [Doc. 10 at 44]. Indeed, the ALJ stated that Plaintiff was "managing his headache pain with NSAIDS, [i]buprofen two to four per week, but mainly

with medical marijuana," [Doc. 8-2 at 20], which is a verbatim recitation of the medical record cited by the ALJ.  *See* [Doc. 8-7 at 552].

In sum, the Court is not persuaded by Plaintiff's challenges on this issue.  The ALJ was permitted to analyze whether Plaintiff's statements concerning his headache pain were consistent with the objective medical evidence, and he determined they were not.  *See Bales v. Colvin*, 576 F. App'x 792, 800 (10th Cir. 2014) (noting that "[c]redibility determinations are peculiarly the province of the [ALJ]"); *Campbell v. Bowen*, 822 F.2d 1518, 1521 (10th Cir. 1987) ("Substantial evidence is more than a scintilla, but less than a preponderance.").

***Plaintiff's Cervical Spine.***  With respect to Plaintiff's DDD of the cervical spine, the ALJ found that Plaintiff's allegations were "entirely inconsistent with [his] general lack of complaints and treatment related to his cervical spine longitudinally since the alleged onset date," including, *inter alia*, records showing that Plaintiff "had normal range of motion findings in the cervical spine during appointments with his pain management provider."  [Doc. 8-2 at 22].  On appeal, Plaintiff argues that the ALJ "misstate[s] . . . the facts, given that there are nearly constant statements in the records of [his] headache pain, which at least some providers opined was due to his cervical spine disease."  [Doc. 10 at 45].  For support, Plaintiff states that MRIs of his cervical spine showed "softening . . . of the spinal cord, as well as mild compression of the spinal cord, which reasonably account[ed] for the pain he experienced."  [*Id.* (quotation marks omitted) (citing [Doc. 8-8 at 686])].

Notably, however, Plaintiff fails to cite a single medical record establishing that his headache pain was caused by issues in his cervical spine.  *See* [*id.*].  And although Plaintiff references the findings of his MRI, those findings did not state that any softening or mild compression of Plaintiff's cervical spine "reasonably account[ed] for" his headache pain, as he

claims. *Compare* [*id.*] *with* [Doc. 8-8 at 686]. Further, insofar as Plaintiff claims that the ALJ did not properly consider his MRI findings as they relate to Plaintiff's pain generally, whether or not related to his headaches, Plaintiff does not argue that the ALJ's RFC determination failed to account for such pain. *See* [Doc. 10 at 45]. In sum, the Court finds that the ALJ's assertion regarding Plaintiff's cervical spine is supported by substantial evidence.

*Plaintiff's History of Smoking.* In the hearing decision, the ALJ noted that Plaintiff "continued to smoke, per the medical records, until October or December 2020, and he therefore voluntarily inhaled toxins into his lungs on a daily basis." [Doc. 8-2 at 22]. In his Opening Brief, Plaintiff contends that "[t]he ALJ did not undertake[,] consider[,] or weigh the fact that [Plaintiff] diligently worked toward stopping smoking and was successful in completely quitting for significant periods of time, receiving praise from his providers." [Doc. 10 at 45]. Although the Court appreciates the challenges to overcome one's smoking habit, Plaintiff does not dispute the factual basis for the ALJ's assertion that Plaintiff continued to smoke in 2020—i.e., the medical records. And he fails to cite any authority to support his claim that the ALJ was required to consider the diligence Plaintiff purportedly exhibited in his efforts to quit, no matter how commendable such efforts may be. *See* [Doc. 8-7 at 647 (Plaintiff's provider congratulating him on quitting tobacco use)]. The Court does not find any reversible error on this issue.

*SSR 16-3p and Plaintiff's Work History.* Finally, Plaintiff argues that "[c]ontrary to the requirements of SSR 16-3p, the ALJ failed to consider evidence that enhanced the consistency of [his] statements, including his good work history in heavy labor jobs and his unrelenting attempts to obtain relief from his symptoms[,] including being willing to try multiple medications and see multiple providers." [Doc. 10 at 46]. The Court also finds no reversible error on this issue.

SSR 16-3p provides a two-step process for an ALJ to analyze a claimant's statements of his or her impairments. *See* SSR 16-3p, 2017 WL 5180304 (Oct. 25, 2017). First, the ALJ considers whether the claimant has a medically determinable impairment ("MDI") that could reasonably be expected to produce the claimant's symptoms. *Id.* at *3. Here, the ALJ found that Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms." [Doc. 8-2 at 19]. Thus, the ALJ complied with this first step.

Second, the ALJ "evaluate[s] the intensity and persistence of those symptoms to determine the extent to which the symptoms limit the individual's ability to perform work-related activities." SSR 16-3p, 2017 WL 5180304, at *3. In considering the intensity, persistence, and limiting effects of the claimant's symptoms, the ALJ examines "the entire case record, including the objective medical evidence; an individual's statements about the intensity, persistence, and limiting effects of symptoms; statements and other information provided by medical sources and other persons; and any other relevant evidence in the individual's case record." *Id.* at *4. As part of that analysis, the ALJ should consider the factors under 20 C.F.R. §§ 404.1529(c)(3) and 416.929(c)(3). *See supra* Section III.

In evaluating a claimant's symptoms, it is not enough for an ALJ "to make a single, conclusory statement that 'the individual's statements about his or her symptoms have been considered' or that 'the statements about the individual's symptoms are (or are not) supported or consistent.'" SSR 16-3p, 2017 WL 5180304, at *10. However, "an ALJ need not engage in a formalistic factor-by-factor recitation of the evidence[,] as long as the ALJ sets forth the specific evidence he relies on in evaluating the claimant's [symptoms]." *Tuttle v. Comm'r, SSA*, 853 F. App'x 246, 251 (10th Cir. 2021) (quotations omitted). Rather, "[t]he determination or decision must contain specific reasons for the weight given to the individual's symptoms, be consistent with

and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms."  SSR 16-3p, 2017 WL 5180304, at *10; *see also Kepler*, 68 F.3d at 391 ("Findings as to credibility should be closely and affirmatively linked to substantial evidence and not just a conclusion in the guise of findings.").  If the claimant's statements regarding the intensity, persistence, and limiting effects of his symptoms "are inconsistent with the objective medical evidence and the other evidence, the ALJ must evaluate whether the claimant's "symptoms are less likely to reduce his . . . capacities to perform work-related activities or abilities to function independently, appropriately, and effectively in an age-appropriate manner."  SSR 16-3p, 2017 WL 5180304, at *8; *Luthy v. Saul*, No. 17-cv-2206-PAB, 2020 WL 6938300, at *6 (D. Colo. Nov. 25, 2020) (same).

Here, Plaintiff states that "a remand is required for an assessment of the consistency of [Plaintiff's] allegations that is based in substantial evidence, and which complies with" SSR 16-3p.  [Doc. 10 at 46].  However, this argument lacks basis.  Indeed, Plaintiff's "good work history in heavy labor jobs" or attempts to seek relief for his conditions are not dispositive evidence of Plaintiff's credibility.  *See, e.g.*, *Bell v. Colvin*, 645 F. App'x 608, 613 (10th Cir. 2016) (where the Plaintiff contended that the ALJ failed to consider various factors—including "difficulties she faced from a young age, her doctor's belief that her symptoms were real, her good work history, and her efforts to obtain relief by traveling to the Mayo Clinic"—finding that "[t]he ALJ is not required to discuss every piece of evidence").

Under these circumstances, the Court sees "no error in the ALJ's failure to discuss [the plaintiff's] work history."  *Jimison ex rel. Sims v. Colvin*, 513 F. App'x 789, 796 (10th Cir. 2013); *see Qualls v. Apfel*, 206 F.3d 1368, 1372 (10th Cir. 2000) (requiring an ALJ only to "set[ ] forth the specific evidence he relies on in evaluating the claimant's credibility" rather than conduct a

"formalistic factor-by-factor recitation of the evidence").  Accordingly, the Court finds that the ALJ properly considered the appropriate factors under SSR 16-3p, whether or not those factors included Plaintiff's "good work history" or "unrelenting attempts to obtain relief from his symptoms."  [Doc. 10 at 46].  In sum, the Court cannot substitute its judgment for the ALJ's, *see Barnett v. Apfel*, 231 F.3d 687, 689 (10th Cir. 2000), and after reviewing the entire record, *see Washington v. Shalala*, 37 F.3d 1437, 1439 (10th Cir. 1994), the Court finds ample support for the ALJ's credibility finding.

### IV.    Whether the ALJ Erred at Step Five When He Determined that Plaintiff Could Perform Jobs that Require Overhead Reaching.

Finally, Plaintiff argues that the ALJ erred at Step Five on the basis that "none of the occupations cited at this Step can be performed within [Plaintiff's] RFC for only occasional overhead reaching," which Plaintiff claims is contrary to SSR 00-4p.  [Doc. 10 at 33].  Specifically, Plaintiff contends that "[a]ll three of the occupations cited to deny the claim at Step Five require 'frequent' reaching, which is incompatible with [Plaintiff's] RFC to only 'occasional' overhead bilateral reaching."  [*Id.*].  As previously mentioned, at the administrative hearing, the VE stated that his testimony was consistent with the DOT and SCO, but he also "use[d] [his] work experience" in six different areas, including overhead reaching.  [Doc. 8-2 at 72].

On appeal, Plaintiff takes particular issue with the ALJ's reliance on the VE's "experience," arguing that the VE "did not elaborate on that 'experience' to explain *how* someone limited to only doing an activity [i.e., overhead reaching] for one-third of the workday could do a job requiring that it be performed for twice that long."  [Doc. 10 at 34].  Plaintiff asserts that the VE's failure to provide such an explanation "was a violation of the Commissioner's policy contained in the Commissioner's June 2020 Vocational Expert Handbook," and "[t]he ALJ failed in his duty to develop the record by failing to make any further inquiry."  [*Id.*].  The Commissioner

responds that the ALJ's reliance on the VE's experience is proper under agency policy and, therefore, the decision should be affirmed.  [Doc. 11 at 19].  The Court respectfully agrees with the Commissioner.

SSR 00-4p requires that the ALJ must identify and obtain a reasonable explanation for any conflicts between the VE's testimony and the DOT and the SCO.  2000 WL 1898704, *2 (Dec. 4, 2000) ("When there is an apparent unresolved conflict between the VE . . . evidence and the DOT, the adjudicator must elicit a reasonable explanation for the conflict before relying on the VE . . . evidence to support a determination or decision about whether the claimant is disabled."); *see also Butts v. Colvin*, No. 14-cv-01958-KLM, 2015 WL 5341784, at *7 (D. Colo. Sept. 15, 2015) ("SSR 00-4p merely requires the ALJ to resolve any conflict between the [DOT] and the VE by 'determining if the explanation given by the VE is reasonable and provides a basis for relying on the VE . . . testimony rather than on the DOT information.'" (citing SSR 00-4p, 2000 WL 1898704, *2)).  "[A]s part of the [ALJ's] duty to fully develop the record," he must "inquire, on the record, as to whether or not there is such consistency."  SSR 00-4p, 2000 WL 1898704, *2.  A reasonable explanation for such a conflict includes a VE's "experience in job placement or career counseling." *Id.*

Here, not only did the ALJ expressly rely on the VE's work experience at Step Five to identify the jobs Plaintiff could perform, but Plaintiff's argument fails to persuade the Court that reversal of the ALJ's conclusion is warranted for another reason—namely, the DOT's descriptions of the three jobs do not distinguish between overhead reaching and reaching in other directions, as Plaintiff acknowledges. *See* [Doc. 10 at 33]; *see also* [Doc. 10-1 at 3; Doc. 10-2 at 3; Doc. 10-3 at 3].  In her Response, the Commissioner cites *Segovia v. Astrue* as an example of the Tenth Circuit's rejection of a similar argument. *See* [Doc. 11 at 20].  The Court agrees that *Segovia* is

illustrative.  In that case, the claimant's RFC was similarly limited to "occasional overhead reaching," and the Tenth Circuit held that substantial evidence supported the Commissioner's decision that the claimant could work as a ticket taker or a cafeteria attendant, positions that required "frequent reaching."  226 F. App'x 801, 804 (10th Cir. 2007).  The Tenth Circuit explained:

> [E]ven a job requiring frequent reaching does not necessarily require more than occasional *overhead* reaching.  The VE was aware of [the claimant's] limitations on overhead reaching, and he testified both that she could perform the jobs he identified and that his opinion of the jobs open to her was consistent with the *DOT*'s specifications.  In these circumstances, the VE's testimony does not conflict with the *DOT* and *SCO* so much as it clarifies how their broad categorizations apply to this specific case.  Further, the *DOT* descriptions for cafeteria attendant and ticket taker do not indicate that these jobs predominantly involve overhead reaching rather than other types of reaching.

*Id.* (citations omitted).

Similarly, here, the VE was aware of Plaintiff's limitations with respect to overhead reaching when he testified that Plaintiff could perform the jobs of electronics worker, circuit board assembler, and electrode cleaner.  [Doc. 8-2 at 24–25].  And, as Plaintiff specifically acknowledges, the DOT descriptions for those jobs do not indicate that they predominantly require overhead reaching rather than other types of reaching.  *See* [Doc. 10 at 33].[17]

In sum, the VE's testimony, based on his experience, that Plaintiff could perform the jobs of electronics worker, circuit board assembler, and electrode cleaner "constitutes substantial evidence supporting the Commissioner's decision to deny benefits."  *Segovia*, 226 F. App'x at 804; *see also Marquez-Flores v. Berryhill*, No. 18-cv-00863-CMA, 2019 WL 1745208, at *10–11

---

[17] Indeed, Plaintiff emphasizes that "'[r]eaching' is defined in the DOT as 'extending hand(s) and arm(s) in *any direction*,'" [Doc. 10 at 33 (emphasis in original)], but he then concludes that his "limitation to *reaching overhead* only 'occasionally' is [therefore] incompatible with all three of these occupations because they all require 'frequent' *reaching*" in any direction.  [*Id.* (emphasis added)].  Plaintiff also fails to cite any authority that contradicts *Segovia*.  *See* [*id.*].

(D. Colo. Apr. 18, 2019) (finding the Tenth Circuit's holding in *Segovia* was "fatal" to the claimant's argument where "[t]he DOT's descriptions of the three jobs [identified by the VE] [did] not distinguish between overhead reaching and reaching in other directions").

### CONCLUSION

For the reasons stated herein, the Court **AFFIRMS** the Commissioner's final decision.

DATED: January 18, 2023                              BY THE COURT:

_____
Nina Y. Wang
United States District Judge